**Roger COLLINS, Petitioner-Appellant,**

v.

**Robert O. FRANCIS, Warden, Ga. Diagnostic and Classification Center, Respondent-Appellee.**

No. 83–8097.

United States Court of Appeals, Eleventh Circuit.

March 15, 1984.

Rehearing and Rehearing En Banc Denied May 23, 1984.

See also 243 Ga. 291, 253 S.E.2d 729 and 271 S.E.2d 352.

Christine A. Freeman, Ralph Goldberg, Atlanta, Ga., for petitioner-appellant.

Janice G. Hildenbrand, William B. Hill, Jr., Asst. Attys. Gen., Atlanta, Ga., for respondent-appellee.

Before TJOFLAT and HILL, Circuit Judges, and SIMPSON, Senior Circuit Judge.

PER CURIAM:

Roger Collins was convicted in the Superior Court of Houston County, Georgia, of rape and murder. He was sentenced to fifteen years imprisonment for the rape and to death for the murder. After exhausting his state remedies, Collins petitioned the district court to issue a writ of habeas corpus setting aside his convictions and death sentence on several constitutional grounds. The district court denied his petition, and we affirm.

## I.

The events leading up to this appeal began on the evening of August 6, 1977. Collins, a black male eighteen years old, and two friends, William Durham, Collins' mother's boyfriend, and J.C. Styles, Durham's cousin, were attending a neighborhood barbecue in Warner Robins, Georgia.

The three men were drinking beer and liquor. At about midnight, they ran out of liquor and set out in Collins' car in search of more. On their way, they saw Delores Lester, who at some point had been sexually intimate with each of the three men, emerge from a car. They stopped and asked her to have sexual relations with them. She declined their invitation. They then offered to give her a ride home, and she got into the car. The four drove around for a while and eventually stopped at a convenience store for beer and gas. From there they drove to a pecan orchard on the outskirts of Warner Robins. As they arrived at the orchard, Delores Lester, apparently fearing the worst, protested that she "had claps" and was "two months pregnant." The men removed the back seat of the car and placed it on the ground. Delores Lester disrobed, and the three men raped her. Collins was first. As Collins performed the act, Durham told Styles that he was going to kill Lester. He boasted that he had killed other people, including a woman he had "done like this."[1] After Collins finished, Delores Lester started screaming "why me?" Durham pulled a knife and told her that if she did not keep quiet he would "rip her damn heart out." Durham and Styles then raped her. When they had finished, Durham took her by one hand and led her up a road further into the orchard. He had his knife in the other hand. Collins took the car jack out of the trunk of the car and followed them. Styles remained by the car. A few moments later he heard about three "licks" being struck. After a brief period of silence, Durham and Collins returned, Durham carrying the jack. They had blood on their shoes, perhaps on their clothes as well. The three men replaced the car seat, gathered Delores Lester's clothes, and left. On their drive back to town, Collins discarded the car jack along the side of the road and disposed of Lester's clothes in a dumpster. They arrived in Warner Robins at 2:30 a.m. and split up.

Styles decided to go to the police. He went to the Warner Robins police department at 10:00 that morning and reported the events we have described. The police immediately turned the case over to the Houston County Sheriff's Office. By that afternoon, Sheriff's deputies had Collins and Durham in custody and had given them their *Miranda* rights. Both remained silent. At about 5:30 p.m. that day Collins was again advised of his rights, but he refused to talk. After a visit from his mother a short time later, Collins decided to cooperate. The Sheriff's chief deputy, Willie Talton, and one of his investigators, Lieutenant Harry Enckler, advised Collins of his *Miranda* rights, and Collins made a statement (First Statement). The officers recorded it on tape; they took no notes. Collins admitted raping and killing Delores Lester. The next day Collins was arraigned before a magistrate. At that time he asked for an attorney. An attorney was appointed at some later date, perhaps as late as September 1. Meanwhile, the sheriff's office discovered that the tape recorder had failed to record Collins' First Statement, so on August 12 Chief Deputy Talton and Lieutenant Enckler decided to reinterrogate Collins. They informed Collins that the tape recorder had failed to record his First Statement and asked him if they could tape it again. Collins consented. The officers then read him his rights and recorded another statement (Second Statement). This statement was less incriminating than the first one. Collins admitted having intercourse with Delores Lester but did not describe it as rape, and he stated that his role in the murder was minimal. He said that he had told Delores that he would not harm her, but that Durham had then struck and killed her. While Collins did admit carrying the murder weapon, the car jack, and giving it to Durham, he said that he did so at Durham's direction.

Collins and Durham were indicted by the Houston County grand jury for rape and malice murder. They were tried separately, Collins' trial occurring first, on November 15, 1977. Styles was not indicted; he was granted immunity and became a prosecu-

---

1. The record does not reflect whether Collins      heard Durham's statements.

tion witness. Before the trial began, the court held a *Jackson-Denno* hearing on Collins' motion to suppress his two statements. The judge found that Collins had given both statements voluntarily, after being advised of and waiving his *Miranda* rights.

In the guilt phase of Collins' trial, the State's theory of the case was that Collins had killed Delores Lester. The prosecutor presented the testimony of several law enforcement officers who had investigated the case, including Chief Deputy Talton and Lieutenant Enckler, several crime lab experts, a pathologist, the clerk at the convenience store where Collins and the others had stopped on the night of the crime, and Styles. The State, having found the car jack that Collins had discarded, introduced it into evidence. The pathologist and the crime lab experts established that it was the murder weapon and bore Collins' right thumbprint. Talton and Enckler introduced the two statements Collins had given them. They testified from memory as to the contents of the First Statement, explaining that the tape recorder they had used to record it had malfunctioned and that a tape of the statement was therefore unavailable. They established the contents of the Second Statement by presenting a transcript of the tape recording thereof. Styles, testifying later, corroborated the First Statement: Collins, Durham, and Styles raped Delores Lester; Durham and Collins took her into the pecan orchard and killed her with the jack Collins had taken from the car. Styles also repeated the comments Durham had made—about others he had killed—while Collins was having intercourse with the victim, and some remarks Collins had made in the car as the three men drove back to town. According to Styles, Collins had said, intermittently, laughing and joking, "hey man you didn't think I was going to hit her up 'side the head too", that "he had killed so many peoples that he can't remember how many," and that "he knocked hell out of Johnny, Johnny down at the liquor store." Finally, Styles testified that Durham had warned him that if he went to the police Durham would "put him into everything me and Roger [Collins] done."

After presenting this evidence, the State rested. Collins presented no defense. In closing, the prosecutor argued that Collins had committed the murder; the defense countered that Durham, not Collins, had killed Delores Lester. The jury found Collins guilty of both rape and malice murder. The sentencing phase of the trial on the malice murder charge followed. The proceeding was brief. The State presented no evidence, and Collins was the only defense witness. He admitted being present at the scene of the crime, but denied killing Delores Lester, stating again that Durham had performed the deed. Collins said little else in mitigation. The jury, finding that Lester's murder was attended by aggravating circumstances,[2] recommended the death penalty. On November 17, 1977, the trial judge, bound by the jury's recommendation, sentenced Collins to death. (He sentenced Collins to fifteen years imprisonment on the rape charge.) The Georgia Supreme Court, on direct appeal, affirmed Collins' convictions and his death sentence. *Collins v. State,* 243 Ga. 291, 253 S.E.2d 729 (1979). The United States Supreme Court, on certiorari, remanded the death sentence to the Georgia Supreme Court for further consideration in light of *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). *Collins v. Georgia,* 446 U.S. 961, 100 S.Ct. 2936, 64 L.Ed.2d 820 (1980). The Georgia Supreme Court reaffirmed the death sentence. *Collins v. State,* 246 Ga. 261, 271 S.E.2d 352 (1980). The United States Supreme Court declined further review, denying certiorari on January 12, 1981. *Collins v. Georgia,* 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 829 (1981).

---

**2.** The two statutory aggravating circumstances found were

    (2) The offense of murder ... was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, ....

\*   \*   \*   \*   \*   \*

    (7) The offense of murder ... was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim. *See* Ga.Code Ann. § 27–2534.1(b) (1978).

On March 16, 1981, Collins filed a petition for a writ of habeas corpus in the Superior Court of Butts County, Georgia. That court denied the petition on August 20, 1981, and the Georgia Supreme Court refused to grant a certificate of probable cause to appeal. The United States Supreme Court denied Collins' petition for a writ of certiorari on April 26, 1982, and on June 24, 1982, denied his petition for rehearing. *Collins v. Zant,* 456 U.S. 950, 102 S.Ct. 2021, 72 L.Ed.2d 475 (1982).

Collins then instituted these habeas corpus proceedings in the district court, presenting ten federal constitutional claims, all exhausted. The court denied each claim presented, without an evidentiary hearing, on December 17, 1982, and on January 4, 1983, denied Collins' motion for rehearing. The district court did issue a certificate of probable cause to appeal, however, and Collins lodged this appeal.

In this appeal Collins presents eight of the ten claims he presented to the district court.[3] Three challenge his convictions only, four challenge his death sentence only, and one challenges both his convictions and his death sentence. The three claims challenging his convictions are: (1) that the jury instructions at the conclusion of the guilt phase of his trial impermissibly shifted to Collins the prosecution's burden of proving every element of the charged offenses beyond a reasonable doubt and thus denied him due process of law; (2) that the admission into evidence of the Second Statement violated the fifth and fourteenth amendments and the rule of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), because it was taken after Collins had requested a lawyer; and (3) that the admission into evidence, through Styles' testimony, of remarks Durham and Collins made during and following the commission of the charged crimes violated Collins' rights of confrontation and against cruel and unusual punishment guaranteed him by the sixth, eighth, and fourteenth amendments and rendered the jury's findings of guilt unreliable.

The four claims challenging Collins' death sentence are: (1) that a juror was excused who did not meet the *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), standard for excusal on the ground of scruples against the death penalty; (2) that the prosecutor's closing argument was inflammatory and prejudicial, violating the due process standards set forth in *Hance v. Zant,* 696 F.2d 940 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983); (3) that the trial judge's jury instructions on aggravating and mitigating circumstances and the Georgia Supreme Court's review of the trial judge's sentencing instructions as a whole were inadequate and violated Collins' eighth and fourteenth amendment rights; and (4) that the Georgia Supreme Court's review of the proportionality of the death sentence in this case was inadequate and thereby violated Collins' right to due process and subjected him to cruel and unusual punishment under the eighth and fourteenth amendments. The final claim, challenging both the convictions and the death sentence, is that Collins' counsel was ineffective at both the guilt and sentencing phases of his trial, thus violating his sixth and fourteenth amendment rights to counsel.[4] Collins asks as an alternative to issuing the writ that we remand the case to the district court for an evidentiary hearing on this claim.

## II.

### A.

Petitioner contends that the trial court's charge to the jury at the conclusion of the

---

**3.** The two claims Collins does not raise on appeal are: that the evidence at trial was insufficient to support a rape conviction, and therefore due process requires that it be set aside; and that the death penalty was administered in a racially discriminatory manner, thus violating Collins' due process and equal protection rights.

**4.** Collins did not raise this claim as fully and in as precise a manner as he might have done; however, he does argue this point in his brief. We give him the benefit of the doubt and address the claim.

guilt phase of his trial shifted the burden of proof to him on essential elements of the crimes charged, in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).[5] The court allegedly committed this error in its definition of implied malice and in instructing the jury, on both malice murder and rape, that it should presume the defendant's intent once it found certain facts. We first consider the instruction defining malice murder; we then consider the instruction on intent.

### 1.

██ The trial court instructed the jury that "[m]alice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." This instruction, as we indicated in *Lamb v. Jernigan,* 683 F.2d 1332 (11th Cir.1982), *cert. denied* ── U.S. ──, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983), did not create a presumption. It merely defined implied malice. *Id.* at 1340. The prosecution was still required to prove beyond a reasonable doubt no provocation and all circumstances indicating an abandoned and malignant heart, before the jury could imply malice. Since the prosecution's burden extended to all essential elements of malice murder, no impermissible burden shift could have resulted from the instruction.

### 2.

Instructing the jury on intent, the trial judge stated:

**5.** The challenged jury charge was, in relevant part, as follows.

A crime, members of the jury, is a violation of a statute of this state in which there shall be a union of joint operation of act and intention.

A presumption is a conclusion which the law draws from given facts. Each of the following presumptions that I am going to give you is rebuttable; that is, each is subject to being overcome by evidence to the contrary. Every person is presumed to be of sound mind and discretion. *The acts of a person of sound mind and discretion are presumed to be the product of the person's will. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts.* A person will not be presumed to act with criminal intention but the trier of facts may find such intention

A presumption is a conclusion which the law draws from given facts. Each of the following presumptions that I am going to give you is rebuttable; that is, each is subject to being overcome by evidence to the contrary. Every person is presumed to be of sound mind and discretion. *The acts of a person of sound mind and discretion are presumed to be the product of the person's will. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts.*

(emphasis added).

Petitioner argues that the italicized portion of this instruction cannot be distinguished from the instruction condemned in *Sandstrom. See* 442 U.S. at 513, 99 S.Ct. at 2453. We see no need to address the constitutionality of the instruction in this case, however. Assuming without deciding that the instruction impermissibly shifted the burden of proof, we hold that the error was harmless beyond a reasonable doubt. *See Lamb v. Jernigan,* 683 F.2d 1332, 1334 (11th Cir.1982); *Holloway v. McElroy,* 632 F.2d 605, 618 (5th Cir.1980), *cert. denied,* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981).

██ An instruction is harmless when it "shifts the burden on an element that is not at issue in the trial . . . ." *Lamb,* 683 F.2d at 1342. The evidence at trial established that Collins and Durham carried the victim

upon consideration of the acts, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is tried.

Criminal intent is a necessary ingredient of crime and proof of that intent must exist before a conviction is authorized. Whether it has been shown is ordinarily for the jury to decide. It may be demonstrated by the acts and conduct of the defendant, it may be inferred from the proven circumstances or it may be presumed where it appears to the necessary or probable consequence of the defendant's acts.

\*   \*   \*   \*   \*   \*

Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing shown an abandoned and malignant heart.

(emphasis added.)

into a pecan orchard; Collins also carried a car jack into the orchard. According to the crime lab experts, someone struck the victim on the head several times with the jack. The prosecutor at trial asserted that Collins struck the fatal blow. Collins denied this assertion; his defense was that Durham killed the victim. Collins did not argue that the victim was not struck with the jack; he also did not argue that the killer acted unintentionally. Thus, the only question before the jury in connection with the murder charge was whether Collins or Durham delivered the fatal blow—intent was not at issue in the case. For this reason, any error in the judge's instructions could not have harmed Collins in any way.

▆ The instruction also could not have harmed Collins as applied to the rape charge. To prove rape the prosecutor was required to establish three elements: (1) penetration of the victim (2) with force (3) without her consent. (Collins admitted the element of penetration.) Intent was not an element of the crime of rape in Georgia when Collins was tried. *See* Ga.Code Ann. § 26–2001 (1978). For this reason, it is clear beyond a reasonable doubt that the intent instruction also could not have affected the jury's verdict on the rape charge.

### B.

Petitioner contends that the admission into evidence of his Second Statement was constitutionally impermissible in light of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Both the Georgia superior court, in its habeas corpus review, and the district court below concluded that his Second Statement had been taken in violation of *Edwards* but that its admission in evidence was harmless beyond a reasonable doubt.

We cannot agree that the admission was harmless; the Second Statement provided the jury with some details of the tragedy and corroborated aspects of the State's case against Collins. The Second Statement in

itself, even though it portrayed Durham rather than Collins as the killer, certainly showed Collins to be right at the scene, engaging in the rape, carrying the jack, and participating in the coverup afterwards. While it was not as incriminating as the First Statement, the Second Statement, having been recorded on tape, was more reliable. The tape recorder failed to record the First Statement, and the officers who took it and introduced it into evidence made no notes of their interrogation. Consequently, they had to testify from sheer memory, and they were cross-examined extensively. It is disingenuous, therefore, for the State to assert that just because Collins' Second Statement incriminated Durham more than Collins it materially aided his case. The State certainly did not consider the statement exculpatory, and beneficial to the defense, when it offered it in evidence.[6]

▆ Though we cannot conclude that the Second Statement was harmless, neither can we agree with the state superior court's, and the district court's, conclusion of law that the admission of that statement violated Collins' fifth and fourteenth amendment rights under the authority of *Edwards.* The facts in *Edwards* were, briefly, as follows. Edwards was arrested, taken to the police station, and interrogated. When he requested counsel, the interrogation stopped, and he was confined to the county jail. The next day, before counsel was appointed, two detectives came to the jail and asked to see Edwards. The jailer told Edwards that he had to talk to the detectives. The detectives advised Edwards of his *Miranda* rights, and he told them he was willing to make a statement without the presence of counsel, which he did. The Supreme Court held that Edwards' conduct did not amount to a waiver of his right to the presence of counsel. The Court couched its holding in explicit terms:

> [W]e now hold that when an accused has *invoked his right to have counsel present during custodial interrogation,* a valid

---

6. In fact, the State argued to the jury that the Second Statement further inculpated Collins in the murder because it constituted a feeble at-

tempt by Collins to extricate himself from his previous confession of guilt.

waiver of that right cannot be established by showing *only* that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having *expressed his desire to deal with the police only through counsel* is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–5 (emphasis added) (footnote omitted).

The Court in *Edwards* held that the use of Edwards' confession against him at trial "violated his rights under the Fifth and Fourteenth Amendments as construed in *Miranda v. Arizona* [389 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)].", 451 U.S. at 479, 101 S.Ct. at 1882. The Court discussed the nature of the fifth amendment right:

> In *Miranda v. Arizona,* the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney. 384 U.S., at 479, 86 S.Ct., at 1630. The Court also indicated the procedures to be followed subsequent to the warnings. If the accused indicates that he wishes to remain silent, "the interrogation must cease." If he requests counsel, "the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct., at 1627.

The *Edwards* Court expressly declined to base its holding on the sixth amendment, or even to discuss how the sixth amendment might relate to the case. 451 U.S. at 480 n. 7, 101 S.Ct. at 1883 n. 7.

The context in which the fifth and fourteenth amendment rights protected in *Edwards* arise is described more fully in *Fare v. Michael C.,* 442 U.S. 707, 717–18, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197, quoting from *Miranda:*

> "If the individual indicates in any manner, *at any time prior to or during questioning, that he wishes to remain silent,* the interrogation must cease. At this point *he has shown that he intends to exercise his Fifth Amendment privilege;* any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, *the interrogation must cease* until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney *and he indicates that he wants one before speaking to police,* they must respect his decision to remain silent."

*Id.,* 389 U.S. at 473–474, 86 S.Ct. at 1627, 1628 (footnotes omitted) (emphasis added). In *Oregon v. Bradshaw,* —— U.S. ——, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Supreme Court reiterated that its *Edwards* test applies "after the accused has 'expressed his desire to deal with the police only through counsel.'" 103 S.Ct. at 2834.

Collins' request for counsel at his arraignment did not place his request in the *Miranda/Edwards* fifth amendment right-to-counsel posture. Collins had already given the police a full tape-recorded confession. He was brought before a magistrate for arraignment the next day; there he asked for a lawyer.[7] Several days later, after the police found out that the recording of Collins' First Statement was worthless, they advised Collins of that fact. They again read him his *Miranda* rights, he indicated that he understood them, and he agreed to make another tape recorded statement. He then gave a full account of the crime.

The trial court found at Collins' *Jackson-Denno* pretrial suppression hearing that Collins had requested an attorney at his arraignment and that preliminarily to both statements he had been fully advised of his

---

**7.** The record does not contain a transcript of    the arraignment.

constitutional right to an attorney. The trial judge later dictated into the record, in more detail, his findings as to Collins' request for an attorney and the voluntariness of his two statements. At that time, he made the following findings.

[A]t the conclusion of the *Jackson-Denno* hearing with respect to this defendant the Court found that any statements [Collins] made while being interrogated by police officers in custody were voluntarily made by him without any coercion or threats or any hope of reward, that he was advised of his constitutional rights in accordance with the *Miranda* decision that he indicated he understood what his rights were and *that he did not request the assistance of an attorney during in-custody questioning,* and that he made certain voluntary statements which the Court permitted to go to the jury for their consideration.

We think it clear that petitioner at no time indicated that he wished to take advantage of his fifth amendment right to silence or to counsel by asking that interrogation cease. Rather, petitioner indicated at arraignment that he desired counsel in the sixth amendment sense, to handle his case. While he did not say exactly why he wanted an attorney, we do know that several days later he was completely willing to talk with the police. If he had not made the general statement to the magistrate that he wanted counsel, we would certainly have no hesitation in declaring that the Second Statement was admissible in evidence. We add only one fact, that at a separate time and place Collins indicated to a magistrate that he wanted to have a lawyer appointed for him, presumably in response to the charges he had heard, with an eye to handling his defense.

Justice Marshall wrote in his dissent to the Supreme Court's denial of certiorari in *Johnson v. Virginia,* 454 U.S. 920, 102 S.Ct. 422, 424, 70 L.Ed.2d 231 (1981),[8] that the "key question [in determining the validity of a statement made after a request for counsel] is whether petitioner's waiver of his right to counsel was knowing, intelligent and voluntary." He also pointed out that "an accused is under no obligation to state precisely why he wants a lawyer." *Id.* These principles are both true, but we do not believe that they require us to find Collins' waiver to have been involuntary in the *Edwards* sense. Collins did not cut off interrogation with the police at any point to request a lawyer. Nobody told him that he had to talk. Although he had refused to make a statement to the police at the time of his arrest, Collins made a complete, and admittedly valid, confession shortly thereafter. He did not request a lawyer until his arraignment the next day. Collins, unlike Edwards, never gave any indication that he would deal with the police only through a lawyer. While, as Justice Marshall indicated, we cannot hang upon the wording of an accused's request for counsel, surely from the circumstances of such a request we can find guidance as to the accused's

**8.** *Johnson v. Virginia, cert. denied* 454 U.S. 920, 102 S.Ct. 422, 70 L.Ed.2d 231 (1981), a case from the Supreme Court of Virginia, involved facts similar to these. Johnson was arrested for murder, advised of his *Miranda* rights, and taken to jail. He spoke briefly to the police, but made no incriminating statements. At his arraignment the following morning, Johnson said he was indigent and asked the court to appoint him a lawyer. The court made the appointment, but before Johnson was informed of the identity of his lawyer, the police interrogated him. The police began by advising Johnson of his *Miranda* rights. Johnson indicated that he understood those rights and that he was willing to make a statement at that time. Johnson proceeded to confess. The Supreme Court of Virginia, though ruling before *Ed-*

*wards* was handed down, upheld the validity of Johnson's confession, finding that it was voluntary and made under a complete waiver of his rights to silence and counsel.

Johnson petitioned the Supreme Court for a writ of certiorari. The Court denied his petition, apparently because it was untimely filed. Justice Marshall dissented, noting, first, that "this time requirement is not jurisdictional and may be waived by the Court 'in the exercise of its discretion when the ends of justice so require.'" 102 S.Ct. at 424 n. 2 (citations omitted). Justice Marshall felt that the Virginia Supreme Court's decision, which had been handed down before *Edwards* was decided, was "so clearly in conflict with *Edwards*" that the decision called for review.

state of mind, which is the key voluntariness inquiry.[9]

In summary, because we have no indication that Collins, at the time of his Second Statement, was told that he had to talk with the officers; because his earlier First Statement was freely given; and because Collins never halted the interrogation or otherwise indicated an unwillingness to talk with the police on either occasion,[10] we find that Collins' Second Statement was admissible.

### C.

Petitioner contends that Durham's comments to Styles while petitioner was having intercourse with Delores Lester, referring to other murders Durham had committed, were both inadmissible hearsay and inadmissible evidence of extrinsic criminal activity, and that the remarks petitioner made while the three men were driving back to town following Lester's murder were inadmissible evidence of extrinsic criminal activity. Petitioner maintains that the admission in evidence of the first group of statements violated the due process and confrontation clauses of the Constitution, and that the admission of the second group violated the due process clause. We examine these two claims in turn.

### 1.

To determine the admissibility of the first group of statements, we must consider the complete factual context in which they were uttered. The relevant scenario began when the three men and Delores Lester arrived at the pecan orchard. There, the men removed the back seat of the car and laid it on the ground. While Collins was having intercourse with Lester on the car seat, Durham pulled out a large knife and approached Styles, who was standing by the car. Pointing the knife at Styles, Durham stated that he intended to kill Lester and, apparently to make his point, bragged that he had killed several other people, including a woman that he had "done this way." After Collins had raped Lester, Durham, still brandishing the knife, forced Styles to follow suit. Afterwards, Durham planted his knife in the ground by Lester's head and slapped her in the face, as he too raped her. Durham then ordered Styles to engage Lester again. While Styles was simulating intercourse, he heard Collins say to Durham words to the effect that "You don't have to kill her, do you?"

After Styles concluded, Lester stood up. Durham grabbed her by the hand and began leading her further into the orchard, and she exclaimed "Y'all going to kill me." Collins started out behind them, but stopped to get the jack from the trunk of the car. Then he followed Durham. Styles, meanwhile, begged the two men to spare her life.

Collins' attorney made timely objection to the introduction in evidence, through Styles' testimony, of Durham's statements that he intended to kill Lester and that he had killed before. Counsel argued that these statements constituted hearsay and that their admission would violate his client's sixth amendment right of confrontation. The trial judge overruled the objection, concluding that the statements were part of the res gestae. The Georgia Supreme Court agreed and observed, in addition, that the statements did not implicate Collins. The Court's comment implied that their admission, if error, was harmless in

---

9. In *Oregon v. Bradshaw*, —— U.S. ——, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), a Supreme Court plurality reemphasized that the *Edwards* inquiry is not mechanical, but rather "*whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances.*" *Id.* 103 S.Ct. at 2834 (emphasis in original.) This case is only helpful for its approach to voluntariness of a confession generally, and not its result; it dealt with a clear request that interrogation be terminated, thus implicating the fifth amendment, and the only question was whether the accused, before making his confession, had initiated further conversation with the police.

10. In fact, Collins had reason to want to talk again to the police; the Second Statement gave him an opportunity to alleviate some of the harm he had done to his case in his First Statement characterization of his role in the crimes.

any event, because Durham's statements did not prejudice Collins.

Durham's statements to Styles about others he had killed do indeed appear to have benefitted rather than prejudiced Collins. Collins argues, however, that those statements, together with Durham's warning to Styles, as the three men drove back to town following the murder, that if Styles went to the police Durham would "put him into everything me and Roger done," showed him to be "tarred with the same brush" as Durham.

Durham's statements, particularly the references to other murders he allegedly had committed, were conceivably admissible for their truth, but not under the res gestae exception to the hearsay rule. That exception, though provided by Georgia statute (see Ga.Code Ann. § 38–305), has generally fallen out of favor as courts have developed more precise terms with which to define hearsay exceptions. The four current generally prevalent exceptions that used to fall under the label "res gestae" are declarations of present bodily condition, declarations of present mental state or emotion, excited utterances, and present sense impressions. *See* McCormick on Evidence 686–711 (2d ed. 1972), 4 Weinstein's Evidence ¶ 803(1)[01]–(3)[06] (1981). We do not need to decide whether the admission of statements solely for res gestae value violates the due process or confrontation clauses of the Constitution because we find other authority in the law of evidence to admit the statements.

■ Durham's statements, especially his statement that he intended to kill Delores Lester, were relevant to Durham's intent or state of mind. Durham's intent was a key issue in this case. Collins raised the issue in his Second Statement by recanting his earlier confession, that he had killed Delores Lester, and labeling Durham as the murderer. The prosecutor placed the issue before the jury when she introduced the Second Statement into evidence. The lawyers, in their closing arguments to the jury at the conclusion of the guilt phase of the case, fully developed this issue of Durham's intent.

The prosecutor's theory of the case was that Collins was the prime culprit in the murder. Armed with the car jack, which the fingerprint expert said bore his thumbprint, Collins followed Durham and Delores Lester into the pecan orchard and beat her to death with the jack. Collins had freely confessed to the murder in his First Statement to the deputy sheriffs, following his mother's visit to the jail the day of his arrest. When he later learned that the tape recorder had failed to record his First Statement, Collins seized the opportunity to change his story.

The defense countered by arguing that Collins' Second Statement presented the truth, that Durham was the murderer. To buttress his argument, Collins' attorney pointed to Durham's comment to Styles that he (Durham) intended to kill Lester. The statements to which Collins now objects were vital to his defense; they gave it credence.

It is plain that the issue of Durham's intent was taken into account by both parties as they structured their cases. Both Styles' testimony and Collins' thumbprint on the jack established Collins' presence at the orchard and specifically at the scene of the killing; Collins' only available defense was that Durham, rather than he, had done the killing.

Durham's statements were admissible as nonhearsay to show his intent, not for their truth.[11] In addition, it could be argued that Durham's statement that he intended to kill Lester fell under the "declarations of present mental state" exception to the hearsay rule. His comment that he had killed before, including the other woman

---

11. Durham's statements of his intent were probably introduced by the prosecutor as a matter of strategy. Had she not brought them out in her direct examination of Styles, Collins' attorney certainly would have elicited them on cross-examination, since they portrayed Durham as the prime motivator of the murder, and, then, in closing argument to the jury, would have accused the prosecutor of deliberately concealing evidence favorable to the defendant.

that he had "done this way," supported that statement and thus constituted indirect evidence of a present mental state.[12]

■ Collins argues that even though authority can be found in the rules of evidence to justify the admission of Durham's statements into evidence, their introduction nevertheless violated his sixth amendment right to confront Durham. While the Supreme Court has not indicated that the right to confrontation is exactly coextensive with the hearsay rules, see *California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970), it is rare that evidence either not hearsay or admissible under a hearsay exception has been excluded as violating the defendant's right of confrontation. The value of confronting a witness lies in testing the trustworthiness of his testimony. Evidence is admitted under the four "res gestae exceptions" to the hearsay rule, even when the declarant is available to testify, for the very reason that it is inherently trustworthy. Therefore, if the statements were admissible as an indirect declaration of present mental state, Collins' right to confront Durham was not violated. If we consider Durham's out-of-court statements not as hearsay, i.e., admitted for their truth, but rather as admitted to show Durham's intent, Collins had no need to confront Durham to test their trustworthiness. The statements were offered only to show that Durham said them.

Styles was testifying only to the fact that he heard the statements, and he could be cross-examined as to whether he had heard them. Therefore, the admission of Durham's statements could not have violated the confrontation clause.

Petitioner's final objection to Durham's statements is that their admission into evidence violated his right to due process. This claim is not convincing. The evidence was clearly probative of Durham's intent and admissible on that issue.[13] The statements were unduly prejudicial only if their contents were taken by the jury as true, if they implicated Collins in the homicides Durham claimed he had committed, or if they showed Collins to be a person of bad character.[14] We balance the probative value against the prejudicial effect of these statements, and then decide whether their admission constituted a due process violation.

■ In evaluating whether an admission of evidence constituted a due process violation, we review the record "only to determine whether [any error we find] was of such magnitude as to deny fundamental fairness to the criminal trial." *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir.), *cert. denied* 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976). To show a denial of fundamental fairness, any error must be "material in the sense of a crucial, critical, highly signifi-

---

**12.** Weinstein describes the confusion courts have apparently felt regarding indirect evidence of a present mental state (hearsay, but within the mental state exception) and evidence admitted not for its truth but to show intent (nonhearsay). Noting that even non-hearsay use of such evidence poses dangers, Weinstein comments

> Rather than focusing on academic analyses intent on rigid classification, it would be more profitable to analyze the probative value of the statement and to examine the dangers stemming from its admission in light of other factors. A meaningful exercise of the *judge's discretion pursuant to* [Fed.R.Evid.] 403 is more conducive to the aims of truth and justice expressed in [Fed.R.Evid.] 102 than a technically brilliant demonstration that the statement in question is an exception to the hearsay rule rather than lying outside its scope.

4 Weinstein's Evidence ¶ 803(3)[02] (1981). We apply this analysis in discussing Collins' due process claim. *See infra* at 1337.

**13.** While a jury instruction limiting this evidence to the issue of intent could have been given, none was requested.

**14.** The statement Collins contends implicated him in the other murders Durham described to Styles was Durham's admonition to Styles that if he went to the police, Durham would "put [him] in everything me and Roger done." This admonition was uttered in the car on the way back from the rape/murder, however, and in that context could only have referred to the Delores Lester crime. We believe it unlikely that the jury linked these statements; they were made in different contexts, and nothing connected them. Moreover, the prosecutor, in arguing to the jury, did not contend otherwise.

cant factor." *Id.* (citations omitted). We find no denial of fundamental fairness in the admission of these statements for two reasons. First, the evidence before the jury did not indicate that Collins had been involved in any way in Durham's previous transgressions, and the prosecutor, in argument, made no attempt to convince the jury that he had been. Second, Collins drew on the statements to support his theory of defense, that Durham, alone, murdered Delores Lester. Thus, the prejudicial effect, if any, of the statements was minimal, and certainly was not enough to outweigh their probative value to an extent that would call into question the fundamental fairness of the trial.

### 2.

The admission in evidence of the second challenged group of statements did not violate the due process clause. Those statements were made by Collins to Styles in the car ride home, to the effect that Collins had killed more people than he could count, and that he had beaten a person at a liquor store. The statements had probative value. They were admissions by Collins, admissible for all purposes. Collins had the opportunity to explain the statements away and to cross-examine Styles about their utterance. We cannot say that the prejudicial effect of these statements so outweighed their probative value that they were a "crucial, critical, highly significant factor" calling into question "the fundamental fairness" of petitioner's trial. *Hills v. Henderson, supra.*

### III.

### A.

Petitioner's first challenge to the sentencing phase of his trial concerns the exclusion of a prospective juror, Janette Gurr, under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). He contends that the exclusion was improper because Mrs. Gurr did not make

"unmistakably clear," as *Witherspoon* requires, that:

(1) [she] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them or (2) [her] attitude toward the death penalty would prevent [her] from making an impartial decision as to the defendant's *guilt.*

391 U.S. at 522–3 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original).

In this case, after extensive discussion aimed at pinning down her feelings about the death penalty, Mrs. Gurr gave a bottom-line response that regardless of the circumstances she could not vote to impose the death penalty. Her final responses were as follows:

The Court: I think, Mrs. Gurr, as I understand what you are saying, and I don't want to put words into your mouth, but it seems like to me you are saying that you would do your best to consider whatever you were supposed to, but that you really don't think that you could impose the death penalty?

Mrs. Gurr: No, sir, I'm afraid I couldn't.

The Court: Is that right?

Mrs. Gurr: Yes, sir.

The Court: And that would be regardless of the circumstances, you're saying?

Mrs. Gurr: I'm afraid I just could not do that.

This response was clearer than those petitioner points to as insufficient to meet the *Witherspoon* criteria in *Hance v. Zant*, 696 F.2d 940 (11th Cir.), *cert. denied* —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983) (one juror felt that there were "times when the death penalty is warranted," other juror stated that she was "confused"), *Granviel v. Estelle*, 655 F.2d 673, 677 (5th Cir.1981), *cert. denied* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982)[15] (juror "didn't think [he] could" impose the death penalty), or *Moore v. Estelle*, 670 F.2d 56 (5th Cir.), *cert.*

---

**15.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of

the former Fifth Circuit handed down prior to October 1, 1981.

*denied* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1375 (1982) (juror didn't "know that [he] would ever feel good about [imposing the death penalty]").

Petitioner contends that the words "*afraid* I just could not" were equivalent to "thinking" one could not. In context, however, general usage of the style "I'm afraid" indicates not that one is in a state of fear, but rather that one is reluctant to admit a fact that may be displeasing. A statement that someone is "afraid I can't" perform an act does not mean that he may or may not perform it; nobody would expect him to perform it.

Juror Gurr's statement is the kind of statement that we give the trial judge discretion in weighing. Unlike the statements in the cases petitioner cites, this statement is as a matter of law capable of being uttered with sufficient force to justify a *Witherspoon* exclusion. The trial judge had the opportunity to notice whether the statement was in fact so uttered and concluded that it was. His findings of fact as to a juror's impartiality, in light of the *Witherspoon* criteria, are presumptively correct. 28 U.S.C. § 2254(d) (1976); *Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981).

Petitioner further contends that the veniremen did not receive the necessary questioning to allow their positions vis-a-vis the *Witherspoon* criteria to appear. This is not supported by the transcript of the jury voir dire. In Mrs. Gurr's case, she was repeatedly asked questions designed to elicit her feelings on both aspects of *Witherspoon,* namely, whether her ability to determine guilt would be affected by her scruples against the death penalty, and whether she would automatically refuse to vote for the death penalty, regardless of what the evidence might reveal.

**B.**

Petitioner contends that prosecutorial misconduct during the closing arguments of counsel at the sentencing phase of the trial was so prejudicial that it denied his due process right to a fair sentencing proceeding and requires that his death sentence be vacated. On direct appeal from his convictions and sentence, petitioner claimed that the prosecutor, in arguing to the jury, improperly commented on several matters not in evidence: she stated that every day the newspapers report crimes like those petitioner committed in this case; that there were no statistics to support the argument that the death penalty does not deter crime; and that petitioner acted like an animal as he raped and murdered Delores Lester. The Georgia Supreme Court found no error in these comments. In his state habeas corpus petition, petitioner alleged that prosecutorial misconduct occurred at both the guilt and sentencing phases of his trial, challenging more of the prosecutor's conduct than he did on direct appeal. We review the portion of the claim petitioner raised on direct appeal, but we do not review the portion he raised only in his state habeas petition because he abandoned that portion during the litigation of his habeas petition in the Butts County Superior Court.[16] In order to prevail on his due process claim raised on direct appeal, petitioner must show that "the prosecutor's actions were so egregious as to render the trial fundamentally unfair." *Hance v. Zant,* 696 F.2d 940, 951 (11th Cir.1983).

The first portion of the prosecutor's alleged misconduct challenged on direct appeal was this statement: "Now arguments have been put forth against capital punishment in that it does not deter crime. But that argument cannot be supported by sta-

---

**16.** Collins presented no argument to the state habeas court on his prosecutorial misconduct claim. The state habeas judge wrote in his dispositive order that petitioner had abandoned claims not argued to him, including the prosecutorial misconduct claim. Collins did not question the judge's decision that he had abandoned the claim by filing a petition for a re-

hearing. He did question the decision in his petition for a certificate of probable cause to appeal, but the Georgia Supreme Court, in denying the petition, rejected the point. Our examination of the record reveals support for the state habeas judge's decision that this claim was abandoned insofar as it was presented only at the state habeas level.

tistics or anything else." [17] Petitioner points out, correctly, that neither side presented any statistical evidence to the jury concerning the deterrent effect of capital punishment on crime. Therefore, he argues, the prosecutor's reference to such "evidence" was improper.

By presenting this claim, petitioner poses three questions: first, whether the jury was entitled to consider the need to deter crime, particularly murder, in deciding what sentence to recommend in petitioner's case; second, whether, in the absence of empirical evidence in the record that capital punishment deters crime, the jury was precluded from considering deterrence in recommending the death sentence; [18] and, third, whether the prosecutor's remark that there were no statistics to support the argument that the death penalty has no deterrence effect somehow rendered the sentencing proceeding fundamentally unfair.

■ The answer to the first question is clear. The U.S. Constitution does not forbid a sentencer to hear argument from counsel on the need for a deterrent sentence and to fashion a sentence to satisfy that need. [19] This is implicit in *United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), and *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

In *Williams,* the Supreme Court considered the type of evidence a sentencer may appropriately take into account in formulating a sentence. There, the jury had recommended that Williams, on trial in a New York state court for a capital offense, be given a life sentence. The judge, relying in part on evidence not adduced at trial that his probation officer had given him, sentenced Williams to death. Williams appealed, claiming that his sentence was invalid because the sentencing judge had denied him due process by relying on information supplied by witnesses whom he had not had the opportunity to confront or cross-examine. The Supreme Court found the judge's conduct inoffensive to the Constitution, stating that "[t]he due process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure." *Id.* at 251, 69 S.Ct. at 1085. The Court cited with apparent approval Judge Ulman's formulation of the four factors a judge should consider in imposing a sentence:

"1st. The protection of society against wrongdoers.

"2nd. The punishment—or much better—the discipline of the wrong-doer.

"3rd. The reformation and rehabilitation of the wrong-doer.

"4th. *The deterrence of others from the commission of like offenses.*

"It should be obvious that a proper dealing with these factors involves a study of each case upon an individual basis." *Id.* at 248, 69 S.Ct. at 1084, citing Glueck, Probation and Criminal Justice 113 (1933) (emphasis added).

---

**17.** The defense promptly objected to this statement on the ground that it referred to matters not in evidence. The court permitted the argument to continue, ruling that the prosecutor was entitled to argue the appropriateness of capital punishment. The court cautioned the jury, however, at the close of the sentence phase of the trial, that it should not consider the arguments of the attorneys as evidence.

**18.** We refer here to "general deterrence" as the deterrent effect of a sentence in one case on others who might otherwise commit the crime, as opposed to "specific deterrence," deterring the criminal who is sentenced from committing more offenses in the future.

**19.** Georgia law as well has consistently allowed counsel to argue to the sentencer, whether judge or jury, that a particular sentence is

designed, in whole or in part, to deter crime and that the immediate need for such general deterrence requires that that sentence be imposed. *See, e.g., Redd v. State,* 242 Ga. 876, 252 S.E.2d 383 (1979); *Chambers v. State,* 134 Ga.App. 53, 213 S.E.2d 158 (1975). Capital cases are, apparently, no exception; indeed, *Redd* is a capital case. The jury, as sentencer, may consider the general deterrent effect of its (recommended) sentence on the commission of crime, especially murder, by others in society. Thus the prosecutor's argument in this case cannot be faulted on the theory that Georgia sentencing policy precludes juries in capital cases from considering the general deterrent effect of the death penalty.

The Supreme Court, in *Grayson,* reinforced its approval of general deterrence as a constitutionally proper sentencing consideration. There, the district judge, in stating his reasons for imposing a sentence, made the following comment:

"In my view a prison sentence is indicated, and the sentence that the Court is going to impose is to deter you, Mr. Grayson, and others who are similarly situated. Secondly, it is my view that your defense was a complete fabrication without the slightest merit whatsoever. I feel it is proper for me to consider that fact in the sentencing, and I will do so."

438 U.S. at 44, 98 S.Ct. at 2612 (emphasis omitted). The court of appeals reversed because the judge had considered false testimony the defendant had given at trial. The Supreme Court in reinstating the sentence addressed what the district judge could properly have considered in fashioning the defendant's sentence. The Court concluded that the judge could consider the defendant's false testimony, basing its decision in major part on the broad purposes served by the federal indeterminate sentencing model. One of these purposes was general deterrence. The Court noted that the Congress, in fashioning the federal sentencing model, had declined to opt for a pure rehabilitative model (where general deterrence is, arguably, irrelevant) in which

" 'convicts [regardless of the nature of their crime] can never be rightfully imprisoned except upon proof that it is unsafe for themselves and for society to leave them free, and when confined can never be rightfully released until they show themselves fit for membership in a free community.... This extreme formulation, although influential, was not adopted unmodified by any jurisdiction. See Tappan, ["Sentencing Under the Model Penal Code, 23 Law & Contemp. Probs. 528, 531–33 (1958) ] .... "The influences of legalism and realism were powerful enough ... to prevent the enactment of this form of indeterminate sentencing. Concern for personal liberty, skepticism concerning administrative decisions about prisoner reformation and

readiness for release, *insistence upon the preservation of some measure of deterrent emphasis,* and other such factors, undoubtedly, led, instead, to [both state and federal] system[s]—indeed, a complex of systems—in which maximum terms were generally employed." *Id.,* at 530.

438 U.S. at 46–47, 98 S.Ct. at 2613–14 (citations omitted) (emphasis added). The Court indicated no qualms whatsoever about the portion of the district judge's comments it quoted, that referred to the deterrent purposes of his sentence. Given the Supreme Court's treatment of general deterrence in these two cases, we cannot conclude that the need for general deterrence is an unconstitutional sentencing consideration.

■ The answer to the second and third questions petitioner poses are equally clear. A sentencer need not have before it proof that a given sentence will deter others from committing crime, particularly the crime the defendant committed, in order to base that sentence in part on a perceived need for general deterrence. Criminal sanctions have historically been justified in part on the theory that they coerce conformity with the law; that without them, there are many who would disobey the law. Such persons obey the law not as a matter of conscience but in order to avoid the sanctions that will be imposed if they disobey. That the prosecutor does not demonstrate empirically the deterrent effect of a sentence should not prevent the State from employing general deterrence as an acceptable sentencing policy. Empirical evidence of the deterrent effect of a sentence would be difficult, if not impossible, to generate with sufficient particularity clearly to guide the sentencer's determination in any given case. We decline to limit the general deterrence consideration to those cases in which its effectiveness can be demonstrated.

Under the sentencing model employed by Georgia in capital cases the jury is given the task, subject to full Georgia Supreme Court review, of fashioning state sentencing policy. In discharging this task, the jury functions as a fact finder in determining the presence of aggravating and miti-

gating circumstances, but acts as a policy maker in determining whether a sentence of death or life imprisonment should be imposed. Therefore, it is singularly inappropriate to restrict the bounds of permissible argument to those bounds which apply at the guilt determining phase. The jury is no longer being asked to determine what has taken place, but rather what justice demands that society perform in response. The vastness of the sorts of arguments that appropriately may be brought to bear on this question are such that it would make a mockery out of the sentencing function to require evidentiary support for every argument presented. Thus, we will not restrict on due process grounds the arguments the jury may receive in carrying out its sentencing function to those based on evidentiary submissions.

██ The prosecutor, here, told the jury that the argument that the death penalty has no deterrent effect cannot be supported statistically. This allusion to the lack of statistical evidence did not flaw the argument under the due process clause. The judge emphatically instructed the jury that argument of counsel was not evidence. Given that the subject matter of the argument was appropriate, counsel's bald assertion that statistical support existed for the argument, or did not exist for the converse of the argument, did not render the sentencing procedure fundamentally unfair.[20]

██ The second portion of the prosecutor's argument petitioner challenged on direct appeal to the Georgia Supreme Court was the following:

> We do not know how many criminals are deterred by capital punishment, no one can know, but what we can see every day you pick up the newspaper is that crimes of this sort, the sort that Roger Collins

inflicted on Deloris Luster [sic], happen every day, that the life of a human being, lives of human beings are sacrificed every day with as little concern as the life of an animal, and that is how Roger Collins killed Lois Luster [sic], like an animal.

The first part of this argument, like the preceding argument, did not offend the due process clause. It was an abstract reference to matters within the jury's common knowledge, concerning a permissible sentencing consideration, general deterrence. The second part of this argument, that Collins killed Lester like "an animal," arose from the evidence presented at trial and was directed to the retributive purpose of a sentence. Since retribution for the offender's crime is certainly a constitutionally acceptable sentencing objective, and since evidence of the brutality of the crime, supporting that objective, was shown at trial, petitioner's challenge to this portion of the prosecutor's argument is meritless. The argument did not render the trial fundamentally unfair.

### C.

Petitioner contends that inadequate sentencing phase instructions and inadequate appellate review of those instructions by the Georgia Supreme Court violated his eighth and fourteenth amendment rights in two ways. First, the trial judge did not define sufficiently the second statutory aggravating circumstance charged to the jury, and the Georgia Supreme Court did not cure this error by its independent review of petitioner's sentence. Second, the trial judge did not clearly inform the jury of its option to recommend a life sentence, and the Georgia Supreme Court likewise did not cure this error by its independent sentence review.

---

**20.** This court's recent panel opinion in *Tucker v. Zant*, 724 F.2d 882 (11th Cir.1984), notes that the retributive justification for capital punishment (*id.* at 889) are relevant for the sentencer's consideration, and that these are not the only relevant issues for the jury to take into account. (*Id.* at 888 n. 5.) That opinion would prevent "emotional and bombastic" discussion (*id.* at 889) of all but the retributive justification for imposing the death penalty, that is, the horribleness of the crime itself. We face, here no "emotional and bombastic" argument on any matter but the crime itself.

### 1.

Petitioner argues that Ga.Code Ann. § 27–2534.1(b)(7)[21] was applied unconstitutionally in this case. *See, e.g., Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). We do not disagree with Judge Tjoflat's conclusion that, under *Godfrey,* the (b)(7) aggravating circumstance was not unconstitutionally applied in this case. In our view, however, we need not reach this issue because petitioner does not argue that the other aggravating circumstance found by the jury in this case, Ga.Code Ann. § 27–2534.1(b)(2) (murder committed in the course of another felony), was applied improperly or unconstitutionally.

▮▮▮ As we read *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and *Wainwright v. Goode,* —— U.S. ——, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983), as long as one valid statutory aggravating circumstance exists, a federal habeas court should not grant relief unless the "evidence or factor in question was constitutionally inappropriate." *Alvord v. Wainwright,* 725 F.2d 1282 at 1286 (11th Cir.1984). Even if the evidence before the trial court in this case would not have supported its finding of the (b)(7) circumstance, the evidence by no means was constitutionally inappropriate. We can envision few capital cases in which the circumstances of the crime are not before the jury to consider; and, given the admittedly proper finding of the (b)(2) circumstance in this case, we attach no constitutional importance to the possibility that the jury may have incorrectly labeled the evidence before it as a statutory aggravating circumstance. *See Zant,* 103 S.Ct. at 2749 (improper "statutory label" "cannot fairly be regarded as a constitutional defect in the sentencing process"). Thus, this contention does not afford Collins a basis for relief.[22]

### 2.

Petitioner contends that the trial judge's instructions were inadequate to inform the jury of its option to recommend life imprisonment. In support of this contention, petitioner cites *Goodwin v. Balkcom,* 684 F.2d 794 (11th Cir.1982), *cert. denied* —— U.S. ——, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983); *Spivey v. Zant,* 661 F.2d 464 (5th Cir. Unit B 1981), *cert. denied* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982); and *Chenault v. Stynchcombe,* 581 F.2d 444 (5th Cir.1978). *Chenault,* in dictum, indicated that the trial judge must instruct the jury on mitigating circumstances and on its option to recommend life imprisonment. *Id.* at 448. *Goodwin* and *Spivey* enforced this dictum. In both cases, the trial judge's instructions failed to mention mitigating circumstances and referred only briefly to a life sentence as a sentencing option under Georgia law. The jury, therefore, did not know that it could recommend a life sentence even if it found an alleged statutory aggravating circumstance.

▮▮▮ The charge in this case correctly informed the jury of its options; in relevant part, it read as follows:

> The law of this state provides that the punishment for murder shall be death or life imprisonment. . . .

> *     *     *     *     *     *

In considering the death penalty, however, you should consider whether there are mitigating circumstances that would incline one to a recommendation of life imprisonment in spite of the aggravating circumstances. Mitigating circumstances are those which do not constitute a justification or excuse for the offense but which in fairness and mercy may be considered as extenuating or reducing the

---

21. This section has been recodified as O.C.G.A. § 17–10–30(b)(7). It singles out murders "outrageously or wantonly vile, horrible or inhuman in that [they] involved torture, depravity of mind, or an aggravated battery to the victim."

22. In *Davis v. Zant,* 721 F.2d 1478 (11th Cir. 1983) the panel reached (in dicta) the same conclusion we adopt here. *See* 721 F.2d at 1488–1489. Although *Davis* has now been vacated and slated for reconsideration *en banc,* we find no reason to question the panel's opinion on this issue.

degree of moral culpability or blame. The youthful age of the defendant is, for example, a mitigating factor which you might consider.

Therefore, if you find that one or more of the statutory aggravating circumstances existed beyond a reasonable doubt you could recommend the death penalty or you could recommend life imprisonment in accordance with my instructions. . . .

\* \* \* \* \* \*

Now if you find one or both of the alleged statutory aggravating circumstances existed but you do not choose to recommend the death penalty because of mitigating circumstances *or otherwise* the form of your verdict would be, "We, the jury, fix the punishment of the defendant at life imprisonment."

(emphasis added.) While the charge did not advise the jury in explicit terms that though one or both aggravating circumstances and no mitigating circumstances were present it could still recommend life imprisonment, we find that the "or otherwise" language presented this alternative, and that the charge as a whole instructed the jury adequately that life imprisonment was an option. This charge was clear enough to be constitutional.

### D.

■ Petitioner argues that the proportionality review conducted by the Georgia Supreme Court in his case was constitutionally inadequate because the Georgia court failed to compare his case with other cases with similar facts and circumstances. The Supreme Court recently held that the Constitution does not require a state supreme court to conduct a proportionality review as long as the state's procedures are not "so lacking in other checks on arbitrariness that it would [otherwise] not pass constitutional muster . . . ." *Pulley v. Harris,* —— U.S. ——, 104 S.Ct. 871, 873, 79 L.Ed.2d 29 (1984). Like the California system at issue in *Pulley* and the Florida system at issue in *Alvord v. Wainwright,* 725 F.2d 1282 at 1301 (11th Cir.1984), it appears clear that

the Georgia system contains adequate "checks on arbitrariness" to "pass muster" without proportionality review. *See, e.g., Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (describing Georgia system). Nevertheless, Georgia has chosen to conduct such a review, *see* Ga.Code Ann. § 27–2537(c)(3); therefore, the Georgia review can be attacked as applied in a given case. *See Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (equal protection/due process right to counsel on first appeal); *Alvord,* 725 F.2d at 1301.

We find no merit, however, in petitioner's attacks on the Georgia Supreme Court's method of conducting this proportionality review. We have carefully reviewed the briefs and record, and many of petitioner's objections assume that the Constitution requires Georgia to conduct a proportionality review, which is not the case. Collins raises some issues that can be characterized as equal protection challenges; however, we have often addressed similar contentions, *see, e.g., Moore v. Balkcom,* 716 F.2d 1511, 1517 (11th Cir.1983); *Henry v. Wainwright,* 721 F.2d 990, 997 (5th Cir.1983), and Collins does not present a claim different from the ones previously resolved by our cases. In *Moore v. Balkcom,* we held that it is not the role of the federal courts to dictate to the state courts the method of conducting a proportionality review so long as the state supreme court's review and result do not rise to the level of unconstitutional action. 716 F.2d at 1517–18; *see also Maggio v. Williams,* —— U.S. ——, 104 S.Ct. 311, 78 L.Ed.2d 43 (1983). The review given in this case clearly was not unconstitutional.

### IV.

Petitioner claims that he was denied his sixth, and fourteenth, amendment right to the effective assistance of counsel at both the guilt and sentencing phases of his trial. The district court summarily denied this claim. Petitioner asks us either to sustain this claim as a matter of law or to remand

it to the district court for an evidentiary hearing.[23]

## A.

The state habeas court conducted an evidentiary hearing on petitioner's ineffective assistance of counsel claim, made findings of fact, and concluded that counsel's performance passed constitutional muster. In *Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), the Supreme Court described the circumstances under which a federal district court must grant an evidentiary hearing on a habeas claim.[24]

> We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

Unless petitioner's ineffective assistance of counsel claim fell within one of these categories, the district court had no duty to grant an evidentiary hearing. We conclude that an evidentiary hearing was not required.[25]

Petitioner contends that he was entitled to an evidentiary hearing in the district court because his habeas hearing in state court was not full and fair and did not resolve the material factual issues presented. He asserts that the state habeas proceedings were inadequate in three respects. First, the court scheduled his evidentiary hearing at a time inconvenient to his counsel and his witnesses. Consequently, he was forced to rely on depositions to support his constitutional claim. Second, the court was required to determine critical facts by resorting to conflicting deposition and affidavit testimony. Third, even if the state court hearing was fair and full, the court failed to find the dispositive facts, thus requiring the district court to hold an evidentiary hearing. We review these three contentions in order.

### 1.

■ To decide the first claim, we must review the events surrounding the scheduling of the evidentiary hearing in state court. We note initially that the ineffective assistance of counsel claim has been ripe since the conclusion of petitioner's trial on November 17, 1977. Petitioner nonetheless had his trial counsel handle his case until March 12, 1981. On that date, two months after the Supreme Court denied his

---

**23.** Petitioner also argued that the district court erred in summarily rejecting his entire petition for a writ of habeas corpus. This argument is meritless. While a statement of the district court's reasoning is always helpful to us on appeal, where, as here, the court was required to make only a legal determination, its failure to explain its conclusion could not have violated Collins' constitutional rights. A district court's failure to make findings of fact necessary to our consideration of the issues on appeal may require a remand for such determination, but, otherwise, we are independently capable of determining issues of law.

**24.** Petitioner cites 28 U.S.C. § 2254(d) (eliminating the presumption of correctness ordinarily accorded state habeas court findings when these findings arose out of a hearing that was not full and fair). This rule does not aid us. If we find, when we apply the *Sain* test, that the

district court should have held an evidentiary hearing, we necessarily find, as well, that § 2254(d) applies to eliminate the presumption of correctness. If the *Sain* test does not mandate a hearing, the presumption of correctness necessarily stands. Our focus is on the *Sain* test, not on the § 2254(d) presumption of correctness determination. *See* discussion in *Thomas v. Zant,* 697 F.2d 977, 983–86 (11th Cir.1983).

**25.** We assume for the purpose of this analysis that petitioner stated a claim on this issue. Naturally, such a determination would have been the first step for the state habeas court to take in addressing petitioner's claim. Since that court took evidence, thus indicating that it found a claim, we proceed to the determination of petitioner's argument that the district court should have granted an evidentiary hearing because the state hearing was inadequate.

second petition for a writ of certiorari, he employed substitute counsel to handle his state habeas corpus action. On March 16, 1981, petitioner filed in the Superior Court of Butts County, Georgia, a motion to proceed in forma pauperis, a petition for a writ of habeas corpus and a motion to stay his scheduled execution. On March 18, the state superior court granted his motion to proceed in forma pauperis, ordered that his execution be stayed pending his habeas corpus action, and set a hearing on his habeas claims for April 14. During the week of March 23, petitioner's counsel, apparently appearing in open court, orally requested the court to continue the April 14 hearing. The court denied his request. On March 30, counsel, simply "to preserve the record," filed a written motion for a continuance, asking that the hearing be continued to May 18 because he needed time to investigate petitioner's claims and the April 14 date was not convenient for petitioner's expert witnesses. He also stated that he had another client whose execution was scheduled for April 13. On April 13, the court again denied the motion for continuance, stating that it would convene the evidentiary hearing on April 14, as originally scheduled, and that if counsel did not wish to present petitioner's case at that time, he could present his case in the form of depositions and affidavits at a later date. Counsel chose the latter option.[26]

Petitioner has never stated in what respects the evidence he presented to the state habeas court, in the form of depositions and affidavits, would have been different had he been granted the continuance he requested. Nor has he ever shown that the lay witnesses who testified by deposition could not have been present for the April 14 evidentiary hearing. His expert witnesses, who apparently could not attend

on that date and whose testimony was presented in affidavit form, played only a minor role in the presentation of his claims. Under these circumstances, we do not feel the denial of the continuance rendered the state hearing less than full and fair. Counsel had a full month to prepare, and presumably could have presented his critical witnesses on April 14. Moreover, petitioner has not shown how the use of deposition and affidavit testimony prejudiced his case.

Petitioner suggests that he was prejudiced because he was not present when his witnesses were deposed. The state court denied his request that the witness be deposed at the prison where he was incarcerated so that he could be present and assist his attorney while they testified. None of the witnesses resided at the prison. The court ruled that they were not required to go to the prison to testify, and that the "law did not require" the State to transport petitioner to the places where the witnesses were located and would be subject to deposition. The court also observed that petitioner's presence at the depositions would present practical problems, the prisoner's security presumably among them.

Collins had no constitutional right to be present when his witnesses were deposed. Nothing in the record demonstrates that the deposition proceedings were rendered fundamentally unfair by his absence. His counsel knew Collins' version of the critical events before he took the testimony of the witnesses. He had at least a week after deposing them to discuss their testimony with Collins and to pursue any points that needed further development.[27] We conclude that these depositions provided Collins with an adequate means of presenting his case to the state habeas court.

26. On April 17, petitioner's counsel moved the court to order the taking of depositions at the prison where Collins was incarcerated and to pay for the costs associated with taking the depositions. The court denied the motion. Petitioner does not argue that the court's, i.e., State's, failure to pay for the depositions rendered the state habeas hearing less than full and fair.

27. The state habeas court requested the depositions by May 1, 1981, and they were taken on April 24. Petitioner's attorney, of course, could have requested a continuance again if he could not obtain the new information by that date.

### 2.

■ Petitioner contends that, as a matter of law, a state habeas court cannot conduct a full and fair hearing if it must resort to conflicting deposition testimony to make its findings of fact. We cannot accept this proposition.

Courts try all sorts of cases on the basis of depositions. A court's subpoena power is limited and witnesses are often unavailable. To hold that a court cannot rely on deposition testimony to resolve a controversy would be to defy precedent as well as reason. We refuse to create an exception for state habeas cases. Accordingly, we reject petitioner's claim that his state habeas hearing was not full and fair.

### 3.

■ We turn, then, to petitioner's third claim, that the state habeas judge did not find the dispositive facts necessary to resolve the ineffective assistance of counsel issue. The judge meticulously found the historical facts on which petitioner based his ineffective assistance of counsel claim, citing the precise testimony on which he based his findings. Petitioner points to no facts that remain to be found. Therefore, the district court had no duty to convene an evidentiary hearing for this purpose. We thus proceed to determine whether, on the facts established, petitioner was denied ineffective assistance of counsel.

### B.

Petitioner states that his counsel was ineffective at trial in three ways. We first articulate the legal principles governing these contentions, and then describe and analyze each of them.

■ The sixth amendment guarantees criminal defendants the right to counsel reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances. *See, e.g., Washington v. Strickland,* 693 F.2d 1243, 1250 (5th Cir. Unit B 1982) (en banc) *cert. granted* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983); *MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir.1960), *modified on*

*other grounds,* 289 F.2d 928 (5th Cir.) (en banc), *cert. denied* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). Whether counsel has rendered adequate assistance is a mixed question of fact and law requiring application of legal principles to the historical facts of the case. *See Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Young v. Zant,* 677 F.2d 792, 798 (11th Cir.1982). The state court's conclusion on this mixed question is not entitled to a presumption of correctness under 28 U.S.C.A. § 2254(d) (1976). *Goodwin v. Balkcom,* 684 F.2d 794, 804 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983). However, the state court's findings of historical fact on the issue are entitled to a presumption of correctness. *Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981).

■ In order to prevail on this claim, petitioner must show by a preponderance of the evidence that counsel was ineffective and that the ineffectiveness caused actual and substantial disadvantage to the conduct of his defense. *Washington,* 693 F.2d at 1262. In evaluating this claim, we must keep in mind that effective counsel is not errorless counsel, and that we should not rely on hindsight in measuring ineffectiveness. *Mylar v. State,* 671 F.2d 1299, 1300–01 (11th Cir.1982) *petition for cert. filed Alabama v. Mylar,* —— U.S. ——, 103 S.Ct. 3570, 77 L.Ed.2d 1411 (1982). We now discuss the three aspects of trial counsel's performance which were allegedly deficient.

■ Petitioner claims, first, that counsel was ineffective because he failed to investigate three possible lines of defense. Failure to investigate lines of defense can support an ineffective assistance of counsel claim. In *Washington v. Strickland,* this court discussed in depth counsel's duty reasonably to investigate lines of defense before making a strategic choice to pursue fewer than all of the possible lines of defense at trial. There, we stated, "[I]n sum, an attorney who makes a strategic choice to channel his investigation into fewer than all plausible lines of defense is effective so

long as the assumptions upon which he bases his strategy are reasonable, and his choices on the basis of those assumptions are reasonable." 693 F.2d at 1256 (footnote omitted). We reiterate that even if the attorney fails to investigate sufficiently a line of defense, petitioner must demonstrate prejudice, "that the ineffective assistance . . . 'worked to his *actual* and substantial disadvantage.'" *Id.* at 1258 (emphasis in original).[28]

The first line of defense counsel allegedly should have investigated was that Collins could not have struck any of the fatal blows because he had a weak left arm. This defense would have required counsel to show conclusively that the victim's assailant struck the blow with his left hand.

██ Counsel had at his disposal no physical evidence or expert opinion to establish this defense. All that the crime lab experts and the pathologist could state was that the victim was struck on the left side of her head. A blood stain pattern analyst, who testified for Collins in support of his state habeas petition, could make no determination from the photographs of the victim's wounds as to what arm the assailant used when he struck the victim. Collins' medical records, also produced in support of his state habeas petition, did show that his left arm was weaker than his right due to osteochonditis dissecens and had a limited range of motion; but whether this would have rendered the arm too weak to strike the blows in question has never been shown. When we consider the paucity of physical evidence to establish this defense, it becomes obvious that, to present it, Collins would have had to testify. As the state habeas judge found, counsel wanted him to testify, but he refused to do so.

To summarize, petitioner faults his trial counsel for not presenting a defense that had no chance of success. Had counsel, during his pretrial investigation, uncovered

the blood stain pattern analyst and Collins' medical records and presented them to the jury, he still would not have shown that the assailant used his left arm to kill Delores Lester or that Collins could not have been the assailant. We conclude that counsel's failure to present this evidence constituted neither (1) inadequate performance nor (2) prejudice.

The second line of defense that petitioner alleges counsel should have investigated is that blood stain pattern analysis of the clothing he and Durham wore on the night of the murder would have exonerated him. The analysis would have shown, petitioner asserts, that when Delores Lester was being struck he was positioned in such a way that he could not have been the striker. To construct this defense, counsel would have had to obtain and submit to a blood stain pattern analyst for examination the following items of evidence: photographs of the ground where the victim lay as she was struck, showing blood from her wounds; Durham's clothing; and Collins' clothing. A blood stain pattern analyst was presumably available to counsel; petitioner presented the affidavit of one, an assistant state medical examiner from Florida, to the state habeas court. She indicated that she could have formed an opinion as to petitioner's position at the moment of the assault only if she had two or more of the above items of evidence.

The photographs, according to the analyst, might have shown how the victim's blood spattered as she was being struck with the car jack and thus enabled one to estimate the extent to which her blood should have appeared on the assailant's clothing. The availability of such photographs depended not on whether the police in their initial investigation could have found blood on the ground, but on whether *counsel,* who could have returned to the scene a week later at the earliest, could have obtained sufficient photographs of

---

**28.** In *Washington* we discussed several tests we could apply in determining whether a habeas petitioner has shown prejudice to his case in asserting an ineffective assistance of counsel claim. In those of petitioner's claims which we deny on the basis of petitioner's failure to show prejudice, we find no prejudice under any of the judicially recognized tests for prejudice in ineffective assistance of counsel cases.

blood on the ground to yield the necessary information. Of course, the intervening weather could have disturbed the ground on which the victim lay to such an extent as to have precluded counsel from finding such evidence. The record is silent on this point.

■ We do not decide, however, whether counsel's failure to procure the photographs necessary to this defense breached his duty to conduct an appropriate investigation, because the other items of evidence indispensable to a presentation of this defense were not available; namely, Collins' and Durham's clothing. Consequently, petitioner cannot prove the prejudice required to make out a sixth amendment claim of ineffective assistance of counsel.

When Collins returned to Warner Robins following the murder, he went directly to his girlfriend's house and threw his clothes into a laundry hamper. The record does not indicate what happened to the clothes thereafter. The record also does not indicate precisely the ultimate disposition of Durham's clothes. Lois Collins, Collins' mother, whose deposition was taken during petitioner's state habeas proceedings, stated that she saw what she presumed to be Durham's clothes at Durham's house one or two days following his arrest. The clothes had blood smears and stains on them. Shortly thereafter, she saw Durham's brother wash out the clothes in a bathtub. The record does not disclose the extent to which this obliterated the blood stains, or what Durham's brother did with the clothes.

Petitioner could argue, though he has not, that his lawyer could have fashioned the blood stain spatter defense by introducing his and Durham's clothing into evidence through the testimony of petitioner's girlfriend, his mother, Durham, and Durham's brother. The record does not disclose what the girlfriend might have said. We have recounted the gist of the mother's testimony. Neither witness, apparently, could produce petitioner's clothing. Nor could petitioner, because he refused to testify during

the guilt phase of his trial. Moreover, in his habeas testimony he made no claim that he could have produced his clothing for blood stain pattern analysis or the jury's examination. Finally, we do not know what Durham or his brother would have said, or produced, if subpoenaed to testify at petitioner's trial. Had they been called to the stand it is extremely doubtful that they would have produced Durham's clothing; in any event, they would most likely have invoked the fifth amendment. Collins, in prosecuting his habeas petition, here as well as in state court, has made no proffer to the contrary.[29]

■ The third defense petitioner alleges his counsel should have investigated is that his participation in Delores Lester's murder was a product of duress exerted on him by his unusual relationship with Durham. Since Durham was the boyfriend of petitioner's mother and a much older man, petitioner argues, Durham had a strong psychological influence over him, which led him to participate in the killing. His only support for this claim is his brief testimony at the sentencing phase of his trial, and on habeas review, that he feared Durham.

Here, again, petitioner fails to show prejudice. Had he elected to testify at trial, his mere statement that he feared Durham would have been insufficient to make out a case of psychological dominance. He has proffered no objective evidence, such as a psychological profile, that would have indicated that Durham dominated him or somehow coerced him into committing murder.

■ Even if we could find prejudice on the basis of petitioner's statement that he feared Durham, we note that the defense of duress would have conflicted with counsel's chosen trial strategy, to show that Durham committed the crime and was the "bad guy" or "prime mover." A reasonable strategic choice can make investigation into other plausible lines of defense unnecessary. *See, e.g., Jones v. Kemp,* 678 F.2d 929, 931–32

---

**29.** In any event, it has not been shown, or argued, that mere testimony as to the blood on the clothes would have been sufficiently pre-

cise for the analyst to have rendered an opinion as to Collins' position at the time of the blow.

(11th Cir.1982). Counsel, having chosen a reasonable strategy to portray Durham as the villain, should not be found ineffective because he did not push a line of defense that his client actually contributed to the victim's death but did so only because he was under psychological duress. Counsel's strategic choice as to the defense in this case was reasonable.

▉ Second, petitioner claims that counsel was ineffective because he failed to impeach Chief Deputy Talton's testimony at trial with a statement Talton made at a pretrial hearing. At trial Talton stated that Collins, in his First Statement, said that he had "raped" Delores Lester. At the pretrial hearing Talton was uncertain as to whether petitioner depicted his intercourse with Ms. Lester as a "rape." The state habeas court concluded that counsel's cross-examination of Talton was, on balance, adequate.

Trial counsel's failure to impeach the policeman's testimony by using prior inconsistent statements is not the kind of error that gives rise to a claim of ineffectiveness. Counsel did cross-examine the policeman thoroughly and challenge his memory. That an attorney does not recall in the heat of trial the precise words a witness may have used on a prior occasion is a relatively frequent occurrence, and does not render the attorney ineffective in a constitutional sense.

▉ Finally, petitioner contends that counsel was ineffective because he failed to investigate for possible use at the sentencing phase of his trial any evidence of mitigating circumstances. Petitioner alleges that counsel failed to look into his character and record and the background of his family. He also alleges that counsel failed to contact his relatives and friends regarding testimony they might have been able to give on the issues of guilt or punishment.

The state habeas court found that counsel spoke extensively with Collins about the chance of presenting a former employer or influential citizen to testify in mitigation of the sentence. Counsel suggested that Collins' mother testify. Collins was reluctant for her to testify, however. In any event, counsel eventually decided that she would not have made a favorable impact on the jury. To support his habeas petition in state court Collins presented affidavits from friends who said they could have vouched for his good character at trial. Counsel countered these affidavits by stating that Collins never gave him the names of such friends; consequently, he made no attempt to uncover any. It is apparent from the state habeas court's dispositive order that the court gave credence to counsel's position that Collins did not give him the name of any character witnesses other than his mother. We accord this finding a presumption of correctness.

Counsel spoke frequently with Collins and more than once with his mother, and made a strategic choice not to call the mother as a witness in mitigation because of her relationship with Durham and her unfavorable reputation in the community. Counsel knew that one of the jurors would probably have had a strong negative reaction toward her. Counsel did put Collins on the stand at the sentencing phase; Collins testified briefly about his background, his employment history, and the events on the night of the murder. He stated that Durham had done the killing, and that he was afraid of Durham. While as a matter of hindsight one might conclude that counsel could have been more persistent in developing evidence in mitigation, we cannot say that he was ineffective and that his client was prejudiced within the meaning of the sixth amendment.

We have carefully considered every claim petitioner has presented in this appeal. We find no constitutional error warranting the issuance of the writ. Accordingly, the judgment of the district court, denying the writ, is

AFFIRMED.

TJOFLAT, Circuit Judge, concurring specially:

I concur in the result and in all but parts II.A.2., III.C.1., and III.D. of the court's

opinion. In part II.A.2., I would set out why the trial judge's instruction to the jury on intent violated the rule set out in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) before finding the error harmless for the following reason. A discussion of the claim is essential, it seems to me, to a discussion of the harmlessness of the error. In order to understand whether the error was harmless we must understand what the error was, including the probable impact of the error on the jury. I also would amplify the court's discussion on why the error was harmless. In part III.C.1., I would reach petitioner's challenge to the second statutory aggravating circumstance because, in my view, *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), does not control this issue adversely to the petitioner. I would find petitioner's challenge to this aggravating circumstance without merit, however. Finally, in part III.D., while I would arrive at the same conclusion as does the panel's opinion, I would discuss the claim more fully. I treat these issues in turn here.

### A.

The trial court instructed the jury on intent as follows:

> A presumption is a conclusion which the law draws from given facts. Each of the following presumptions that I am going to give you is rebuttable; that is, each is subject to being overcome by evidence to the contrary. Every person is presumed to be of sound mind and discretion. *The acts of a person of sound mind and discretion are presumed to be the product of the person's will. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts.*

(emphasis added).

To determine whether this instruction relieved the prosecutor of the burden of proving an essential element of either malice murder or rape, we must, as *Sandstrom* directs, give "careful attention to the words actually spoken to the jury, . . . for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." 442 U.S. at 514, 99 S.Ct. at 2454.[1] Applying this approach, the intent instruction here would be erroneous in the following manner.

The intent instruction in this case created a mandatory rebuttable presumption. It was mandatory because there was no permissive language, such as "the jury may infer"; the language indicated that the jury must apply the presumption on proof of the basic facts. The instruction was prefaced by language indicating that the presumption was rebuttable; however, the instruction did not advise the jury as to the quantum of evidence *the defendant* needed to produce to rebut the presumption. The *Sandstrom* Court, assessing an intent instruction similar to the one before us, considered this deficiency to be fatal, because it effectively shifted the burden of proof on the element of intent to the defendant.

> [T]he jury may have interpreted the instruction as a direction to find intent upon proof of the defendant's voluntary actions (and their "ordinary" consequences), unless *the defendant* proved the contrary by some quantum of proof which may well have been considerably greater than "some" evidence—thus effectively shifting the burden of persuasion on the element of intent.

442 U.S. at 517, 99 S.Ct. at 2456 (emphasis in original). The presumption on intent in Collins' case, like Sandstrom's, could have been interpreted by a reasonable juror to require the defendant to rebut it by more than "some" evidence. Since, under Georgia law, intent was clearly an element of malice murder at the time of Collins' trial,[2]

---

**1.** In *Sandstrom,* the Supreme Court was analyzing the following intent instruction, similar to the one involved here: "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 513, 99 S.Ct. at 2453.

**2.** Georgia law defined malice murder in the following way: "A person commits the offense

a presumption that in the mind of a reasonable juror could have placed the burden of persuasion on the defendant to disprove intent was constitutionally impermissible.

Keeping this analysis of petitioner's claim in mind, I move on to the question of whether the giving of the instruction was harmless beyond a reasonable doubt.[3] In *Lamb,* we found harmless error beyond a reasonable doubt where evidence of guilt was so "overwhelming" that the improper instruction could not have contributed to the jury's decision to convict. 683 F.2d at 1342–43. Here, I conclude that the improper presumption was harmless beyond a reasonable doubt because it did not relieve the jury of its duty to resolve a contested issue or shift the burden of proof thereon. *See Holloway v. McElroy,* 632 F.2d 605, 618 (5th Cir.1980), *cert. denied* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981).

The improper instruction was that "[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts." To determine whether this instruction was harmless, one must examine the "acts" Collins committed on which the jury might have applied the presumption to find intent.

With regard to the murder, the evidence established that Collins and Durham took the victim off into the pecan orchard. Collins carried the car jack. The victim was struck several times on the head with the jack, according to the crime lab experts; Styles heard three blows. Collins and Durham returned, Durham carrying the jack.

The prosecutor's factual and legal position throughout the trial was that Collins struck the fatal blow. Collins' defense was a straightforward denial; he argued that

Durham killed Delores Lester. Accordingly, Collins did not dispute that the victim was hit in the head with the car jack and that whoever struck her intended to kill her. He never suggested, much less argued, that the killing was an accident. The only question the parties posed for the jury, therefore, was who struck the victim. The trial judge's instruction that the jury should presume that the act (the striking of the blows) showed an intent on the actor's part to accomplish the natural and probable consequences of that act (the victim's death) did not relieve the jury of its duty to find the disputed fact (the identity of the actor); nor did it shift to Collins the burden of proving that he was not the person who struck the blows.

In this case, unlike *Franklin v. Francis,* 720 F.2d 1206 (11th Cir.1983), the assailant's intent to cause death was not a subject of dispute. In *Franklin* the defendant was accused of malice murder when the gun he was holding discharged. The central issue was whether he purposely fired the gun at his victim. How much burden the jury placed on Franklin to present evidence that he lacked intent to cause the death was crucial to the jury's resolution of the intent issue. In this case, in sharp contrast, intent to cause death was not in dispute. I cannot imagine how a jury could conclude that when a man crushes the skull of a helpless female victim by repeatedly smashing her over the head with a car jack he does not intend her death.

I emphasize that we do not deal, here, with a presumption of *criminal* intent. Rather, we deal only with a presumption that proof of an act (by one who is of sound mind) shows intent to bring about the consequences of the act. I reiterate: in this case there is no dispute that the act took

---

of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another person." Ga.Code Ann. § 26–1101 (1978).

**3.** In *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), the Supreme Court did not agree whether a violation of *Sandstrom* could be harmless where the error involved an element of the offense not express-

ly conceded by the defendant. Four justices decided that such error could not be harmless, and four indicated that where "a defendant's actions establish intent so conclusively as if it were unequivocally conceded," error could be found harmless. I follow our decision in *Lamb, supra,* and the latter *Connecticut v. Johnson* view in finding harmless error in this case.

place and that the perpetrator of the act intended the natural and probable consequences thereof—death.

Petitioner could argue, though not convincingly, that he committed other "acts" from which the jury, applying the presumption, could have found that he intended to kill the victim. For example, he carried the jack to the place where the victim was murdered, and he did not ask Durham to spare the victim's life. His precise argument would be that from these two acts, alone, the jury presumed that he intended to kill the victim. These two acts alone, however, would not have authorized the jury to presume that Collins intended to kill Delores Lester.

We must assume that the jurors listened to, understood, and applied the law as it was read to them; this is the linchpin of *Sandstrom* analysis. If the jurors applied the presumption, as it was given to them, to the naked act of carrying the jack or failing to plead for the victim's life, they could not have used it to find that Collins intended to kill Delores Lester. Neither of those acts had *as its natural and probable consequence* the victim's death. In a broad sense, these acts may have been part of a chain of causation ending in the victim's death; yet the jury could not logically or reasonably have found that death was the natural and probable consequence of either of them.

I also conclude that the presumption did not allow the jury to shortcut a finding of rape. To prove rape, the prosecutor was required to establish three elements: the defendant's penetration of the victim, with force, against her consent. Collins admitted that he penetrated the victim. Intent was not an element of the crime of rape in Georgia when Collins was tried. *See* Ga. Code Ann. § 26–2001 (1978). The challenged instruction bore only on intent so, in this context, *Sandstrom* was not implicated. The only elements of the crime of rape remaining for the State to prove were force and lack of consent. If the jury presumed the natural and probable consequences of the penetration, it could not have concluded that the penetration was forceable or

against the victim's will. The challenged presumption was irrelevant in the rape context. Thus, the jury's evaluation of Collins' guilt on the rape count, as on the malice murder count, was neither helped nor hindered by this particular presumption.

In summary, when one measures for the harmlessness of error caused by an improperly burden-shifting presumption, one should ask whether "a reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption." *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 983 n. 5, 74 L.Ed.2d 823 (1983) (Powell, J., dissenting). Harmless error may occur in two ways; the first is, as we noted in *Lamb,* where the evidence of guilt is so overwhelming that the jury could not have relied on the presumption. The second is, as in this case, where the impermissible presumption applied to the particular facts does not yield any ultimate fact that takes a contested issue from the jury. With respect to the malice murder charge, the only act of which the natural and probable result was death, thus creating a presumption of intent to kill, was the striking of the victim on the head with the car jack. It is uncontested that the striker intended to kill the victim; there was no evidence, or argument by either side, that the striker merely intended to injure the victim or that the killing was an accident. As for the rape charge, intent was not an element of rape in Georgia and even if it were, Collins admitted the first element of the offense, that he intended to, and did, penetrate the victim. The presumption certainly played no role as to the remaining elements of the offense. Accordingly, the presumption instruction was harmless beyond a reasonable doubt.

### B.

The statutory aggravating circumstance on which petitioner challenges the trial court's instructions was the one described in Ga.Code Ann. § 27–2534.1(b)(7) (1978), that the offense of murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an

aggravated battery to the victim." The actual charge tracked the statutory language but did not include the phrase "or an aggravated battery to the victim." The charge did not define torture or depravity of mind. The jury specifically found this statutory aggravating circumstance.[4]

In resolving petitioner's challenge to this jury instruction, I would first ask whether in light of *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), we even need to reach this challenge. Petitioner only attacks one of the statutory aggravating circumstances submitted to the jury, conceding that the other was validly found. *Stephens,* arguably, would automatically foreclose petitioner's claim of error.

In *Stephens,* the United States Supreme Court faced a situation where the jury had found two statutory aggravating circumstances and sentenced Stephens to death. On its independent review of the sentence, the Georgia Supreme Court had found one of the statutory aggravating circumstances to be invalid but upheld the death sentence. The Supreme Court, relying on the Georgia Supreme Court's description of the function of statutory aggravating circumstances, found that as long as one statutory aggravating circumstance was found, and the evidence supporting the invalidated statutory aggravating circumstance was properly admitted for any reason, the death sentence could constitutionally stand. The Supreme Court noted, however, that "[o]ur decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to ensure proportionality." 103 S.Ct. at 2749. We recently applied *Stephens* in *Burger v. Zant,* 718

F.2d 979 (11th Cir.1983). There, too, the Georgia Supreme Court had invalidated all but one of the statutory aggravating circumstances charged; yet it upheld the death sentence on the basis of the remaining statutory aggravating circumstance the prosecution had established.

Here, the Georgia Supreme Court has upheld the death sentence on the basis of *both* statutory aggravating circumstances, never reaching the question of whether, if one of the circumstances were invalid, it would still have upheld the sentence. Thus, we have been deprived of the kind of knowledge on which the Supreme Court in *Stephens* in part based its determination. Because of this distinction, *Stephens* may not control this case. If the (b)(7) circumstance is invalid, the entire sentence may be invalid. Therefore, I believe that we must address the merits of petitioner's (b)(7) claim.

Petitioner's attack on the trial court's (b)(7) instruction raises two questions: first, whether the court should have given a limiting instruction guiding the jury in applying section 27–2534.1(b)(7), and, second, whether the Georgia Supreme Court, in its independent review of petitioner's sentence,[5] erred in concluding that the jury's finding of "torture or depravity of mind" was supported by the evidence.

Petitioner cites *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), as requiring that a jury instruction on the (b)(7) circumstance include more comprehensive language than that contained in the statute. I disagree. *Godfrey* considered whether the (b)(7) aggravating circumstance was overbroad as applied in that case.[6] A Supreme Court plurality not-

---

4. The first statutory aggravating circumstance submitted to the jury, that the murder was committed in the course of a felony, in this instance rape, Ga.Code Ann. § 27–2534.1(b)(2), was also specifically found by the jury. Petitioner does not contest the trial judge's instructions on that aggravating circumstance.

5. The independent review of a death sentence by the Georgia Supreme Court is mandated by Ga.Code Ann. § 27–2537(c)(2) (1978).

6. The Supreme Court plurality, in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1974), found § 27.2534.1(b)(7) not overbroad on its face with the following explanation: "It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." 428 U.S. at 201, 96 S.Ct. at 2938 (opinion of Stew-

ed that the prosecutor had frankly admitted to the jury that Godfrey had not tortured his victims, and that he had made no claim that Godfrey had subjected them to aggravated battery. The plurality then reviewed the evidence and concluded that it was insufficient to show a depravity of mind greater than that present in any murder. Without reaching the question of precisely how the jury should be instructed in a (b)(7) case, the plurality reversed the Georgia Supreme Court's judgment insofar as it left standing the death sentence because the sentence had been based entirely on the (b)(7) statutory aggravating factor. We have read *Godfrey* as not requiring that a (b)(7) instruction be given in language more comprehensive than that contained in the statute. *Stanley v. Zant,* 697 F.2d 955, 970–72 (11th Cir.1983). In *Westbrook v. Zant,* 704 F.2d 1487 (11th Cir.1983), we indicated that the constitutionality of a (b)(7) finding depends not on the way a trial judge phrases his instruction on the (b)(7) aggravating circumstance but, instead, as the petitioner next questions, on whether the Georgia Supreme Court, in its independent review of the evidence, could have reasonably concluded that the murder involved torture, depravity of mind or an aggravated battery to the victim. *Id.* at 1504–05.

In reviewing petitioner's sentence initially, on direct appeal, the Georgia Supreme Court found that the evidence established the (b)(7) aggravating circumstance. The United States Supreme Court, on certiorari, vacated the judgment of the court as to the death sentence and remanded for consideration in light of *Godfrey.* On remand, the Georgia Supreme Court once again found that the evidence supported the jury's finding. Citing Georgia cases, the court found "torture" in the sense of serious physical abuse to the victim because eyewitness testimony, supplemented by the autopsy re-

port, indicated that the victim had been repeatedly raped and repeatedly sodomized prior to death. The court also found that this treatment of the victim demonstrated depravity of mind. The court held that

> the present jury was authorized to find, consistently with the United States Supreme Court's holding in *Godfrey* that, beyond a reasonable doubt, the murder of the victim was of a type universally condemned by civilized society as "outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind . . . ." *See Mulligan v. State,* 245 Ga. 881, 268 S.E.2d 351 (1980).

On Collins' subsequent petition for certiorari, the United States Supreme Court denied the writ.

I could not hold section 27–2534.1(b)(7) unconstitutional as applied in this case. Reviewing the evidence, as did the High Court in *Godfrey,* I find that the multiple acts of rape and sodomy,[7] cited by the Georgia Supreme Court, and the several blows of the jack, of which at least the first did not kill the victim,[8] support the finding of torture under the statute. *House v. State,* 232 Ga. 140, 205 S.E.2d 217 (1974), *cert. denied* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217, *reh'g denied* 429 U.S. 873, 97 S.Ct. 189, 50 L.Ed.2d 154 (1976). Depravity of mind comprehends the kind of mental state that leads a murderer to torture. *Blake v. State,* 239 Ga. 292, 236 S.E.2d 637, *cert. denied* 434 U.S. 960, 98 S.Ct. 492, 54 L.Ed.2d 320 (1977). Though the Georgia judges who reviewed the evidence in this case disagreed as to which of these acts constituted torture, and the jury found the aggravating circumstance in the disjunctive language of the statute, "torture or depravity of mind," these tangential issues do not, as petitioner contends, take away from the sufficiency of evidence to support the Georgia Supreme

---

art, Powell, and Stevens, JJ.) (footnote omitted).

7. Petitioner argues that the evidence did not support a finding that sodomy had occurred because it was not admitted or described by the participants in the crime. The autopsy report indicated semen in the victim's rectum, how-

ever, and such evidence was at least as persuasive as the rape participants' failure to recount sodomy in their confessions.

8. The evidence established that the victim was struck in the armpit once, while she was still standing up, and that she was killed by one of several blows to the head.

Court's finding on remand, and thus the constitutionality of the application of the section 27–2534.1(b)(7) aggravating factor in this case.

### C.

Petitioner contends that the Georgia Supreme Court's review of his sentence for proportionality denied him due process and subjected him to cruel and unusual punishment under the eighth and fourteenth amendments.[9] Georgia Code Ann. § 27–2537(c)(3) (1978) requires the Georgia Supreme Court to make the following determination in regard to death sentences on direct appeal:

> Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

The court, reviewing for proportionality in this case, found that:

> "similar cases set forth in the appendix support the affirmance of the death penalty. Roger Collins' sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant . . . .

*Collins v. State,* 243 Ga. at 299–300, 253 S.E.2d at 735. The court cited seventeen purportedly similar cases in the appendix to its opinion.

The first question I would address is the proper extent of our review in this case. I note first that there is no constitutional requirement that a state in constructing its capital punishment scheme require a state appellate court to review a death sentence for proportionality. *Pulley v. Harris,* —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In *Pulley,* however, the United States Supreme Court indicated that it approves state capital punishment schemes as constitutional on a state-by-state basis, and that some state schemes might have so little

else in the way of checks ensuring rational imposition of the death penalty that proportionality review could be a necessary inclusion in those state schemes. *Pulley* at ——, 104 S.Ct. at 880. Therefore, since state appellate proportionality review is a statutorily mandated check in the Georgia capital punishment scheme approved in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and *Gregg's* discussion of the statute emphasizes the benefit of the proportionality review, I could not conclude that if the Georgia Supreme Court altogether failed to carry out its statutory responsibility to conduct proportionality review in a given case, the imposition of the death penalty in that case would be necessarily constitutional.[10] Petitioner's claim, as I read it, is that the Georgia Supreme Court failed in his case to adhere to its statutory responsibilities and conduct a meaningful proportionality review and that such failure was of such a magnitude as to violate the Constitution. I do not reach the question of whether the Georgia Supreme Court would have violated the Constitution in petitioner's case had it not complied with the mandate of Georgia law, because I find that it conducted a meaningful proportionality review.

Petitioner argues that "minimum standards of due process" required the Georgia Supreme Court to articulate "in *some* fashion what aspects of a particular case or defendant were examined in determining whether or not the sentence is proportionate." I disagree. The Georgia Supreme Court cited seventeen similar cases, thus giving us sufficient information to allow us to determine what it considered in finding petitioner's sentence proportionate. No further articulation of the court's thought process was necessary to enable us to conduct our review.

Petitioner claims that the court's proportionality review was unconstitutional because the court did not consider cases "simi-

---

9. This claim was exhausted in the litigation of the habeas petition petitioner filed in the Superior Court of Butts County, Georgia.

10. I thus would not be as quick as the court, *supra* at 1343, to decide that the Constitution would permit Georgia, having provided a proportionality review, simply to fail to conduct it in a given case.

lar" enough to his own. I review this claim by examining the record to determine whether the cases the Georgia Supreme Court considered were "similar" enough to petitioner's to render the statutory command constitutionally applied.[11] "Similar" in this context is not a term capable of precise definition. The district court in *Blake v. Zant,* 513 F.Supp. 772, 814 (S.D.Ga. 1981), *appeal argued* February 4, 1982, No. 81–7417 (11th Cir.1981) (footnote omitted), noted that:

> To a degree perhaps unequaled in any other area of law, capital cases appear to implicate the perspectives and attitudes of the individual reflecting upon them. Thus, even in the basic statement of a case, enormous differences may appear in the way observers characterize relevant facts and circumstances. These differences can surely have much significance for, how and against what other "similar cases" a particular crime and criminal are considered.

Petitioner argues that "similar" in this case should mean "having the same facts or circumstances." To say that a proportionality review must be so limited would misrepresent the statutory requirement as it was approved for constitutional purposes in *Gregg.*

In *Gregg* and more recently in *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the High Court indicated that the state may single out for death penalty consideration certain aggravated murders, and that the imposition of the death penalty in such cases will not be constitutionally disproportionate to cases not presenting statutory aggravating circumstances. The question, then, is whether the death penalty imposed in this case is disproportionate when one compares it with the pool of cases in which the death penalty was an alternative. This proportionality review, *theoretically,* might well include an examination both of other cases in which

the death penalty was imposed, and of those in which the evidence established a statutory aggravating circumstance but the jury elected not to impose the death penalty. The review might also include those cases presenting a statutory aggravating circumstance in which the prosecutor did not seek the death penalty.

I cannot, however, find arbitrary the decision of a court obligated to perform proportionality review to consider only those cases where the death penalty was actually imposed. A comparison of the case under review with others in which the death penalty has been imposed can readily be made by the Georgia Supreme Court on its own initiative, because it has already reviewed those cases and the sentencing rationales in those cases are a matter of record. This is not true, however, with regard to the other comparable cases—those in which the jury elected not to impose the death penalty and those in which the prosecutor did not seek that penalty. It would be difficult indeed for the Georgia Supreme Court, on its own initiative, to compare the case under review with those cases, since none of them would have been presented to the court for capital sentence review and many may not have been presented to it for any review. Moreover, such cases would add little information to that already considered by the court when it examines cases where the death penalty has been imposed. From the latter group of cases the court can tell whether the sentence it is reviewing is in the same class with others where the death penalty is imposed. While certainly other cases where the death penalty was not imposed would further flesh out the information before the court, they are not so vital to a determination of proportionality that the court must seek them out. If the defendant presents such cases to the court, however, the court might have some obligation to consider them.

---

11. It is not this court's function, here, to conduct de novo review of the proportionality of Collins' sentence, *see Moore v. Balkcom,* 716 F.2d 1511, 1518 (11th Cir.1983). We do, however, review whether the Georgia Supreme

Court "properly perform[ed] the task assigned to it under the Georgia statutes." *Gregg,* 428 U.S. at 224, 96 S.Ct. at 2948 (White, J., joined by Burger, C.J., and Rehnquist, J., concurring).

Petitioner has pointed us to no case that the Georgia Supreme Court failed to consider in conducting its proportionality review. Most of the seventeen cases the court cited as similar involved defendants sentenced to death because the jury found at least one of the statutory aggravating circumstances found in Collins' case, or two other statutory aggravating circumstances. I cannot fault the court for choosing those cases for comparison purposes.[12]

Petitioner asserts that the court's proportionality review was restricted to the narrow question of whether anyone had ever been sentenced to death under the (b)(2) or (b)(7) aggravating circumstances. He argues that the court did not consider whether his individual level of culpability was in line with that of the defendant in other cases. He supports his argument by citing the life sentence Durham received for the same crime, albeit in a separate prosecution. There is nothing in the two Georgia Supreme Court opinions that reviewed petitioner's sentence, or elsewhere in the record, to support this claim.

The Georgia Supreme Court's review of petitioner's sentence was comprehensive; the court discussed his proportionality claims as follows:

Collins argues that his death penalty should not be upheld inasmuch as Durham, his co-defendant, was given only a life sentence. We have never followed any simplistic rule that where one of multiple co-defendants is given a life sentence, none of the other co-defendants may be sentenced to death. Neither have we created a *per se* rule that where the trigger man does not receive the death sentence, it may not be imposed on other participants in the crime. *Hall v. State,* 241 Ga. 252, 244 S.E.2d 833 (1978).

The evidence does not establish Durham as the prime mover or sole perpetrator of this murder. Collins' car was used. He was the one who propositioned the victim and offered to take her home. After the victim stated she had a venereal disease to avoid the rape, he told her if he caught the disease from her, he would harm her. He removed the seats from the car that were used in the rape of the victim and raped the victim first. He took the jack

---

**12.** The Supreme Court's recent brief discussion in *Maggio v. Williams,* —— U.S. —— at —— – ——, 104 S.Ct. 311 at 320, 78 L.Ed.2d 43 (1983), of the Constitution's requirements regarding proportionality review supports a determination that the Georgia Supreme Court acted in conformance with the Constitution in this case. The Court, while not directly addressing a definition of "similar" case or a "proportional" sentence, vacated a stay of execution granted by the Fifth Circuit Court of Appeals pending the Supreme Court's planned discussion of what constitutional proportionality review requires. Williams, convicted of killing a security guard while robbing a grocery store, challenged the Louisiana Supreme Court's proportionality review of his sentence because the court conducted a district-wide, rather than a state-wide, proportionality review. In denying the stay, the High Court stated:

As Williams notes, Justice WHITE recently granted a stay in a case raising a proportionality challenge to a death sentence imposed in Texas. *Autry v. Estelle,* 464 U.S. [——, 104 S.Ct. 24, 78 L.Ed.2d 7] (1983). Also, on October 31, the Court declined to vacate that stay. In that case, however, the Texas Court of Criminal Appeals, like the California Supreme Court in *Pulley,* had wholly failed to compare applicant's case with other cases to

determine whether his death sentence was disproportionate to the punishment imposed on others. Under those circumstances, it was reasonable to conclude that Autry's execution should be stayed pending the decision in *Pulley,* or until further order of the Court.

That is not the case here. Our prior actions are ample evidence that we do not believe that the challenge to district-wide, rather than state-wide, proportionality review is an issue warranting a grant of certiorari. Our view remains the same. *Nor did Williams convince the lower courts that he might have been prejudiced by the Louisiana Supreme Court's decision to review only cases from the judicial district in which he was convicted. Indeed, the District Court examined every published opinion of the Louisiana Supreme Court affirming a death sentence* and concluded that Williams' sentence was not disproportionate regardless whether the review was conducted on a district-wide or state-wide basis. We see no reason to disturb that judgment. Finally, Williams has not shown, *nor could he,* that the penalty imposed was disproportionate to the crimes he was convicted of committing.

(emphasis added).

from the trunk of the car and followed Durham and the victim into the orchard. He had blood on his feet and admitted that he had hit the victim first and then had given the jack to Durham to complete the killing.[13] His finger print was on the jack.

Under the circumstances we cannot say that Collins was a bystander or an unwilling or passive participant. On the contrary, the evidence clearly establishes that he was an active participant in all aspects of the rape and murder of the victim. *Hill v. State,* 237 Ga. 794, 229 S.E.2d 737 (1976).

In reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed for murder. We find those similar cases set forth in the Appendix support the affirmance of the death penalty. Roger Collins' sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Code Ann. § 27–2537(c)(3).

*Collins v. State,* 243 Ga. at 299–300, 253 S.E.2d at 735. In sum, I cannot agree with petitioner that the Georgia Supreme Court failed to carry out its statutory mandate to consider similar cases and determine the proportionality of petitioner's sentence, calling into question the constitutionality of petitioner's sentence.

---

**13.** Petitioner reargues the evidence, asserting that he was no more guilty, if guilty at all, than his cohorts. This argument sidesteps the jury's finding that petitioner was guilty of both rape and malice murder and its recommendation of a death sentence. The evidence also supported a finding that petitioner was more culpable than his cohorts.